# Thompson v. Childers et al.

(Decided October 22, 1929.)

H. C. KENNEDY and WM. M. CATRON for appellant.

DENTON & PERKINS for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming in part and reversing in part.

The appellant, Charles Thompson, is the father of two girls, Louise and Christine. Louise is eight years old and Christine is younger. Their mother was the adopted daughter of the appellees, Ed Childers 'and Owen Childers. Owen Childers is the grandmother and the dominating character in this tragedy, because a situation such as is presented by this record is always a tragedy. Louise Thompson has spent nearly all of her life with her grandparents. They have supported and maintained her since she was an infant. Christine was born at the home of appellees, and has spent much of her time with them. The name of their mother was Marie, who was adopted by appellees when she was a mere infant. She married Charles Thompson, and the marriage did not result in happiness. As to who was at fault is not material to a determination of this case. She had instituted suit against the appellant on two occasions for maintenance for herself and children. They were finally reconciled, and were living together at the time of her death in June, 1928. She had been in ill health for some time. The children had been with the grandparents, under their care and protection.

Before her death she requested her husband to allow the appellees to have the care and custody of both of these children. He agreed to it. After her death he had a conversation with appellees, and he agreed with them that they might have the care, custody, and control of the children. He admits that he had such a conversation with appellees, but he does not agree that he consented irrevocably to allow the children to remain with them. He admits that he agreed with his wife prior to her death that he would allow the children to remain with the grandparents, but he says the circumstances were such that it was for the best interest of his wife to agree to comply with her questions, as she was seriously ill at the time, and that he consented to her request for that reason alone.

After the death of his wife, one of the witnesses testified to the conversation between appellant and the grandmother as follows: ''I was there at the time they buried her and Mrs. Childers came out after supper and she asked Charlie what he was going to do with the children, that she wanted to know and she told him to make up his mind to let her keep them then, and she said she wanted all her troubles together and if he meant to take them to take them now and he said he thought she could do better by them than he could.''

This was a reasonable request, as human nature is such that children grow into the hearts of those who have their care and custody, and the longer these children remained with the grandmother the more the tendrils of her love would envelop them. She wanted him to take them away at that time if he was going to take them at all. In this solemn hour, left without a wife, with two small children looking to him for support and guidance, he consented that the appellees should take the children. Taking the evidence as a whole on this point, the court is driven to the conclusion that appellant was of the opinion that it was best for his children to allow them to remain with the grandparents. He consented that they should do so.

Later he married again, and, according to the testimony, he married a most excellent woman, thoroughly capable and qualified in all respects to have the care and custody of the children. The evidence establishes beyond question that he is a fit father and proper person to have charge of them. He now desires them, and he obtained the possession of one of them, whereupon the appellees

instituted suit to obtain the possession of that child. He then sought to obtain possession of the other child. The chancellor allowed him to retain the possession of one and left the possession of the other with appellees. This is a tragic arrangement. Two little sisters ought not to be separated, unless the exigencies of the occasion make it imperative.

Section 2016, Ky. Stats., leaves no discretion to the court ordinarily in such matters. The surviving parent "if suited to the trust" shall have the custody, nurture, and education of the infant child. The court has recently had occasion to consider the proper construction of this statute. Moore v. Smith, 228 Ky. 286, 14 S. W. (2d) 1072: Cummins v. Bird, 230 Ky. 296, 19 S. W. (2d) 959; Mason v. Williams, 165 Ky. 331, 176 S. W. 1171; Hampton v. Alcorn, 213 Ky. 599, 281 S. W. 540; Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358.

Under the present statute, the surviving parent is entitled to the custody of the child, if suited to the trust. Some of the cases cited deal with the question of whether the surviving parent is suited to the trust, and that is always an important question. It is true that many of the opinions deal with the question of what is best for the child, but the statute makes it conclusive that it is best for the child to be with the surviving parent if the surviving parent is suited to the trust.

But counsel for appellees raise another question which confronts us and which must be determined. They argue that the surviving parent may voluntarily surrender the right given to him by the statute to have the care and custody of the child, although he is suited to the trust. This means that there can be an agreement in the nature of a contract whereby the custody of the child is surrendered to others, if the contention of counsel is correct. The courts are divided on this question. It has been before the courts of different states many times, and some of the opinions are to the effect that such an agreement cannot be recognized and enforced as a legal and conclusive contract. These courts have held that such a contract is against public policy, but the courts so holding make exceptions to the general rule. In some states the courts have gone so far as to hold contracts transferring the custody of a child to be prima facie valid and to cast on the parent the burden of proving that their enforcement would not be for the best interest of the child. It has generally been held by the courts

upholding such contracts that a reasonable and proper agreement by a parent to surrender the custody of a child is a sufficient consideration for a promise by the foster parents to the natural parent, or to the child. Under the rules of common law a husband and wife could not make any agreement between themselves to transfer the custody of the child from one to the other, but the modern tendency is to uphold the right of the parties upon separation to make a valid contract for the care and custody of the child. The divergent opinions of the courts on this question are referred to and discussed in 20 R. C. L. p. 603, 46 C. J. p. 1231, in discussing the question, uses this language: ''There is a conflict of opinion as to the validity of a contract or agreement by which a parent surrenders or transfers the legal right to the custody and control of his child to another person.''

Continuing, the same authority thus discusses the rule declaring such an agreement invalid and the rule declaring an agreement valid. It is said: ''There is much authority in support of the view that, in the absence of statutory provisions, such as those relating to adoption and apprenticeship, an agreement by a parent permanently transferring the custody of a child is invalid as being contrary to public policy, and is not binding upon, and cannot be enforced against, the parent who may at any time revoke the consent so given to such other persons having the custody, and recover possession of the child, although, even in the jurisdictions which adhere to this rule, it is generally held that the transfer will be enforced if for the best interests of the child.''

A long line of decisions is cited in the notes in support of the text. Probably half of the states follow the rule as thus stated. The contrary rule is then stated in the following language: ''In many cases, especially the later American decisions, it has been held that a parent can by agreement surrender the custody of a child so as to make the custody of the person to whom it is surrendered legal, provided such contract or agreement is properly executed upon a sufficient consideration, and is not induced by fraud, coercion, or undue influence; and it has been held that the parent cannot revoke his release of the right to the custody or recover possession, of the child, unless he can show a clear breach of the agreement, or abuse of the child, or that the welfare of the child demands that the parent resume its custody. The fact that the custody given to another by the parent partially

denies association of the child with brothers and sisters is not sufficient to set aside a contractual provision for custody. But the right of a parent to the custody of a child is not lost beyond recall by an act of relinquishment performed under circumstances of temporary distress or discouragement.''

As there are two rules prevailing in the American courts touching the particular question, it is necessary to determine whether Kentucky has aligned herself on the side of either of the disagreeing courts. There are a few decisions in which it has been held that such contracts were not binding, and an examination of these decisions is called for. One of them is Stapleton v. Poynter, 111 Ky. 264, 62 S. W. 730, 23 Ky. Law Rep. 76, 53 L. R. A. 784, 98 Am. St. Rep. 411. It was held in that case that a contract made by the mother relating to the custody of her infant child was not binding, because at the time she made the contract she was under the legal disability of coverture. That case, therefore, is not authority one way or the other, because the point was not presented.

Another case is that of Mason v. Williams, 165 Ky. 331, 176 S. W. 1171. In that case the mother had made a contract relating to the custody of her child, but after her death her husband sought to obtain the custody of the child, and the court held that the husband was not bound by the contract of his wife. That case is not authority.

The case of Hampton v. Alcorn, 213 Ky. 599, 281 S. W. 540, is another case where the question was alluded to, but it does not appear in that case that any contract on the part of the father was established whereby he agreed to surrender the custody of the child to its grandparents. The case is not in point, and is referred to only because relied on in brief.

Another case relied on by appellant is that of Rallihan v. Motschmann, 179 Ky. 180, 200 S. W. 358. The court held that under the facts in that case the father was entitled to the custody of the child, but he had made no contract or agreement to part with the custody of the child. Such an agreement had been made by his wife.

The case of Ellis v. Jesup, 74 Ky. (11 Bush.) 403 seems to place this jurisdiction on the side of the court, upholding the validity of such contracts. The facts in that case were strikingly similar to the facts in the case under consideration. It was pointed out there that the

authority of the parent over his infant child is derived from the duty he is under to protect, maintain, and educate it, and that the custody of the child is placed in the father to enable him the more effectually to perform these natural duties imposed upon him, and partly as a recompense to him for his care and trouble in the discharge of those duties.

The court pointed out the same reason for placing the custody of a child with its father that Blackstone gives in his discussion of the same question. The court, after pointing out the reasons why the custody of an infant should be with the father, then stated: "If the authority of the father over his infant child arises from these considerations, it would seem when the father had surrendered his infant child to a third person to discharge these natural duties for it, and such third person had actually performed them, that the authority of the father over the child would cease and pass to the person standing in loco parentis."

The rule appears sound. Society demands that a father shall support his infant children. It is one of the burdens of life which he should not be allowed to escape. He must feed them, clothe them, educate them, train them, and do all things which are fit and proper to develop them into good citizens. The father is entitled to the love and companionship of his children, which are compensation for his unselfish service in caring for them. This is all as it should be. If a father desires to make a contract whereby his children may receive these advantages, and he be relieved, at least in part, of the burden of their support, there is no good reason why the contract should not be enforced. He cannot, by making such a contract, escape the natural responsibility placed upon him, but he can place himself in a position where he is only secondarily liable for the support and education of his children. As long as the person to whom the custody has been surrendered faithfully performs the duties which the father should have performed, good conscience demands that he be estopped from repudiating his agreement to the distress of those having the custody of the children, and the children themselves.

It is only natural that he should love his children, and he is not to be censured for his desire to regain their possession, but, once having surrendered it voluntarily and freely, he may not take them away from those to whom he surrendered them without first showing that it

would be for the best interest of the children to do so. In this instance he had surrendered them to their grandparents, and it would require more to enable a court to uphold his contention than if he had surrendered them to strangers. By no means should he be denied the society of his children within reasonable limits so long as his association with them does not interfere with their proper upbringing. Courts should always see to it that a parent is allowed to see his children and enjoy their society at reasonable times and on reasonable occasions. This is a matter that may be governed by mutual agreement between the custodian of the children and the parent, or by order of court.

There is yet another case where this court has upheld the validity of such agreements. That is the case of Bedford v. Hamilton, 153 Ky. 429, 155 S. W. 1128. Having taken our position on the side of the courts that uphold the validity of such contracts, we see no good reason to depart from it.

Under statutory law, the father was entitled to the care and custody of these children because he was a person suited to the trust. By his own voluntary act he agreed to surrender that statutory right to the appellees, and, as long as it is best for the children, his agreement may not be repudiated by him. It is true that he denies that he made an unconditional agreement, but the proof overwhelmingly supports the contention of appellees.

The judgment is affirmed on the original appeal and reversed on the cross-appeal, and remanded, with directions to the chancellor to enter a judgment in conformity with this opinion.